## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

JOSEPH ELWELL, CRYSTAL )
ELWELL, DEBORAH BALDWIN, )
Individually and as custodian for her )
Minor children WM and AM, )
ROBERT BALDWIN, )
                     )    Case No. 2:16-CV-158
       Plaintiffs, )
                     )
   v. )
                     )
FIRST BAPTIST CHURCH OF )
HAMMOND, INC., )
                     )
       Defendant. )

### DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES
### TO PLAINTIFFS' COMPLAINT

NOW COMES the Defendant, FIRST BAPTIST CHURCH OF HAMMOND, INC., by and through its attorneys, HeplerBroom, LLC, and for its Answer and Affirmative Defenses to the Plaintiffs' Complaint at Law, states as follows:

### The Parties

1.      Plaintiffs Joseph Elwell and Crystal Elwell resided in Schererville, Indiana between September 2006 and July 2009. They currently reside in Yuma, Arizona and have done so since September 2009.

**ANSWER:**    **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

2.      Plaintiff Deborah Baldwin ("Ms. Baldwin") resided in Crown Point, Indiana from August 2003 until August 2008. From August 2008 until January 2009, Ms. Baldwin resided in New Holstein, Wisconsin. She is the mother and custodian of AM and WM, who are both minor

children. She currently resides with her children and husband, Plaintiff Robert Baldwin, in Kiel, Wisconsin and has done so since January 2009.

**ANSWER:     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

3.       First Baptist Church of Hammond, Inc., formerly known as First Baptist Church of Hammond, an Indiana non-profit domestic corporation, was at all times relevant located at 507 State Street, Hammond, Indiana (hereafter, "First Baptist Church").

**ANSWER:     Admit.  However, Defendant's full legal name is First Baptist Church of Hammond, Indiana, Inc.**

### The Relevant Non-Parties

4.       Between March 2001 and July 31, 2012, Jack Schaap was employed as the pastor of First Baptist Church (hereinafter, "Pastor Schaap"). Pastor Schaap also served as the Chancellor of Hyles-Anderson College, a ministry of First Baptist Church.

**ANSWER:     Admit.**

5.       At all times relevant, Thomas Kimmel served on the Board of Deacons for the First Baptist Church, served on the Hyles-Anderson College Board of Directors, and was held out by Defendant as a certified financial independence consultant and debt management specialist. Mr. Kimmel was hired by the First Baptist Church to provide one-on-one financial counseling at the church. He operated out of an office space in a building next to the church, which was owned by Defendant (hereafter, Kimmel's "First Baptist Church Office").

**ANSWER:     Defendant admits only that Thomas Kimmel served on the Board of Deacons for First Baptist Church and the Hyles-Anderson College Board of Directors, and that Mr. Kimmel provided debt counseling to First Baptist Church members.  Defendant**

denies the remaining allegations of this paragraph completely or accurately reflect the nature of the relationship between Mr. Kimmel and First Baptist Church.

**Jurisdiction and Venue**

6.      This Court has diversity jurisdiction over the parties and this action pursuant to 28 U.S.C. §1332 as the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and, as set forth in paragraphs 1 through 3 above, is between citizens of different states. As set forth more fully herein, Plaintiffs Joseph and Crystal Elwell bring these claims to recover losses for investments they made through Defendant in the amount of approximately $225,000.00. Plaintiffs Deborah and Robert Baldwin bring these claims to recover losses for investments they made through Defendant in the amount of approximately $235,400.00.

**ANSWER:**      **Defendant admits only that this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. Defendant denies the remaining allegations of this paragraph.**

7.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(1) through (2) as Defendant's principal place of business is located herein, in the City of Hammond, Lake County, Indiana and a substantial part of the events or omissions giving rise to the claims occurred in this district.

**ANSWER:**      **Defendant admits only that this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1391(b)(1) through (2) and that Defendant's principal place of business is located in Lake County, Indiana. Defendant denies the remaining allegations of this paragraph.**

## Factual Allegations Applicable to All Counts
### *Pastor Schaap and Mr. Kimmel Were Agents of the Defendant*

8.     At all times relevant, Pastor Schaap was employed as the Pastor of First Baptist Church and regularly conducted church services and masses attended by Defendant's parishioners, including Plaintiffs.

**ANSWER:     Defendant admits only that Pastor Schaap was the Pastor of First Baptist Church and as part of his official duties he conducted church services for church members.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.**

9.     Defendant granted Pastor Schaap the sole authority to hire and fire his staff at First Baptist Church.

**ANSWER:     Defendant admits only that at all relevant times there was a human resource procedure for hiring and firing.  Further pleading, Defendant denies that Pastor Schaap had sole authority to hire and/or fire individuals at First Baptist Church.**

10.     By January 2006, Pastor Schaap had hired Mr. Kimmel to act as an employee of First Baptist Church for the purposes of providing financial advice, debt counseling, budgeting, and investment advice to members of the First Baptist Church. Upon information and belief, Defendant paid Mr. Kimmel a salary or stipend to act as a financial advisor to its parishioners.

**ANSWER:     Defendant admits only that Mr. Kimmel was an independent contractor who taught debt counseling classes to First Baptist Church members.  Defendant denies that it paid Mr. Kimmel a salary to act as a financial advisor to church members.**

11.     Defendant provided Mr. Kimmel with an office on Defendant's property with his name and title on the door for the purposes of meeting with parishioners of First Baptist Church and providing them with financial, investment, budgeting and debt counseling.

4

**ANSWER:**   Defendant admits only that Mr. Kimmel had an office at First Baptist Church. Defendant denies the remaining allegations of this paragraph.

12.   During church services, Pastor Schaap would inform members of the church that Mr. Kimmel was the church's financial advisor with offices on church premises and was available to members of the church for financial advice.

**ANSWER:**   Defendant denies that the allegations of this paragraph.

13.   Pastor Schaap would preach from the pulpit about investing through Mr. Kimmel and would encourage members of the congregation to attend classes taught by Kimmel about handling finances, investing money and getting out of debt. Pastor Schaap informed parishioners from the pulpit that Mr. Kimmel's financial services would provide them with more money which would, in turn, allow them to give more money to Defendant First Baptist Church and aid its ministry and mission.

**ANSWER:**   Defendant admits only that Pastor Schaap would preach from the pulpit generally about eliminating debt.  Pastor Schaap also preached from the pulpit that church members should not do business with one another.  Further answering, Defendant denies all of the allegations of this paragraph.

14.   If a member was interested in meeting with Mr. Kimmel at his First Baptist Church Office on Defendant's property, Defendant would set up the appointment for Mr. Kimmel and make the necessary arrangements.

**ANSWER:**   Defendant admits only that a secretary working at the First Baptist Church would from time to time take incoming phone calls when Mr. Kimmel was not at the church for the purposes of recording a meeting date and time requested by a church

member.  Defendant did not provide Mr. Kimmel a secretary.  Further answering, Defendant denies the remaining allegations of this paragraph.

15.     Through the above mentioned representations and manifestations of Pastor Schaap, and through Defendant providing Mr. Kimmel with his First Baptist Church Office and setting the appointments at that office, members of the congregation, including Plaintiffs, were instilled with a reasonable belief that Mr. Kimmel was employed by Defendant for the purposes of providing financial counseling and investment advice to members of First Baptist Church.

**ANSWER:**     **Defendant denies the allegations of this paragraph.**

16.     Through the actions of Pastor Schaap and through Defendant providing Mr. Kimmel with his First Baptist Church Office and setting the appointments for financial counseling at that office, Defendant placed Mr. Kimmel in a position that enabled him, while apparently acting within the authority of Defendant, to provide financial counseling and investment advice to members of the First Baptist Church, including Plaintiffs.

**ANSWER:**     **Defendant denies the allegations of this paragraph.**

17.     By employing Mr. Kimmel, providing him an office on church property, arranging and setting his appointments, and providing him financial compensation for his services, Defendant consented to Mr. Kimmel acting as its agent for the purposes of providing financial advice to members of the church.

**ANSWER:**     **Defendant denies the allegations of this paragraph.**

18.     Mr. Kimmel was, in fact, employed by Defendant and held out by Defendant and its agent, Pastor Schaap, as a financial advisor providing financial advisory services to members of First Baptist Church.

**ANSWER:**     **Defendant denies the allegations of this paragraph.**

6

19.    Mr. Kimmel agreed to the arrangement with First Baptist Church and did, in fact, meet with parishioners at his First Baptist Church Office for the purpose of providing financial advice at all times relevant to this complaint.

**ANSWER: Defendant admits that Mr. Kimmel met with church members about his debt counseling classes. Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph relative to Mr. Kimmel's believed agreement.**

20.    Beginning in or around February 2006, Mr. Kimmel began informing parishioners about an investment in a collateralized note program related to Sure Line Acceptance Corporation, (the "Sure Line Investments"). Mr. Kimmel represented to parishioners, including Plaintiffs, that:

    a.  Sure Line was a company located in North Carolina that operated car lots under the name of Automocion, and that Sure Line made loans and financed cars in the sub-prime market;

    b.  The Sure Line Investment was a Collateralized Note Program that held a two-to-one collateral ratio for each dollar invested;

    c.  An investment in a Sure Line collateralized note could earn investors as much as 12% interest per year;

    d.  The corporate officers and managers of Sure Line were all Christian and were of like beliefs;

    e.  That Mr. Kimmel had $450,000 of his own money invested in Sure Line;

    f.  That the First Baptist Church of Hammond and Pastor Schaap had invested $1,000,000.00 in Sure Line;

   g. That Pastor Schaap endorsed the Sure Line Investment; and,

   h. That Mr. Kimmel would not receive any commission or payment from investments in Sure Line.

(Subparagraphs 20 a through h are collectively hereafter, the "Sure Line Investment Representations").

  **ANSWER:** **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, including all of its sub-parts, a. through h.**

  21. Mr. Kimmel made these Sure Line Investment Representations to parishioners of First Baptist Church during the classes he taught at First Baptist Church about budgeting, finances and debt while acting in his employ with Defendant. Mr. Kimmel also made these Sure Line Investment Representations to parishioners of the First Baptist Church during meetings arranged by Defendant with parishioners in his First Baptist Church Office to provide them the financial advice he was hired to provide.

  **ANSWER:** **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

  22. Mr. Kimmel and Pastor Schaap reached agreements by which they would both receive commissions for sales of the Sure Line Investments. Specifically, Pastor Schaap received a 1% commission on each First Baptist Church parishioner's investment, while Mr. Kimmel received a 10% commission. Pastor Schaap and Mr. Kimmel did not disclose these commissions to any parishioners.

  **ANSWER:** **Defendant denies the allegations of this paragraph.**

23. First Baptist Church and Pastor Schaap could have terminated Mr. Kimmel's ability to provide financial services to parishioners, solicit the Sure Line Investments, and the right to use his First Baptist Church Office for the same purposes at any time.

**ANSWER: Defendant admits only that Mr. Kimmel was an independent contractor for First Baptist Church whose services could have been terminated at any time. Defendant denies the remaining allegations of this paragraph.**

24. Upon information and belief, in or about November 2007, Pastor Schaap and Mr. Kimmel were advised by an attorney retained by First Baptist Church named David Gibbs that they should not be offering the Sure Line Investments to parishioners because it could violate Indiana law and the parishioners were largely unsophisticated investors.

**ANSWER: Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

25. Upon information and belief, on or about November 7, 2007 attorney Gibbs wrote a letter to Mr. Kimmel advising him and Pastor Schaap that selling the Sure Line Investments could expose Defendant and Mr. Kimmel to liability for selling unlicensed securities.

**ANSWER: Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

26. Despite this information, Defendant did not terminate Mr. Kimmel's ability to provide financial advice to its parishioners. Rather, Pastor Schaap and Mr. Kimmel continued to use their positions as agents of the Defendant to encourage parishioners to meet with Mr. Kimmel and discuss the Sure Line Investments, all the while earning their undisclosed commissions.

**ANSWER: Defendant denies the allegations of this paragraph.**

9

*Mr. Elwell's Investments*

27.     Joseph Elwell is sixty-one (61) years old and currently lives in Yuma, Arizona, where he is pastor of the Liberty Baptist Church of Yuma. Mr. Elwell graduated from Hyles-Anderson College in 1986, and has spent the past 29 years serving as a pastor and missionary starting churches across the United States.

**ANSWER:     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegation of this paragraph.**

28.     Since January 2000, Mr. Elwell has been employed by First Baptist Church as a Missionary. From May 2006 until July 2009, Mr. Elwell was employed by First Baptist Church as the North American and Caribbean director for the Fundamental Baptist Mission Board operated by First Baptist Church. During that time, Mr. Elwell also taught classes at Hyles-Anderson College, a ministry of the First Baptist Church of Hammond.

**ANSWER:     Upon information and belief, Defendant admits the allegations in this paragraph.**

29.     Through his involvement with the First Baptist Church of Hammond, Mr. Elwell came to learn of investment opportunities offered through Thomas Kimmel, a financial counselor through the church.

**ANSWER:     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

30.     Pastor Schaap informed Mr. Elwell that he had hired Mr. Kimmel to act as a financial advisor to the people of First Baptist Church.

**ANSWER:     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

31.     In or about December 2006, Mr. Kimmel approached Mr. Elwell in the administrative office at Hyles-Anderson College regarding investing in a company called Sure Line Acceptance Corporation (hereinafter "Sure Line").

**ANSWER:     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

32.     In soliciting Mr. Elwell to invest in Sure Line, Mr. Kimmel made the following representations (hereafter, the "Solicitation of the Elwells"):

    a.   That Sure Line was a company located in North Carolina that operated car lots under the name of Automocian, and that Sure Line made loans and financed cars in the sub-prime market;

    b.   That the corporate officers and managers of Sure Line were all Christian and were of like beliefs;

    c.   That Mr. Kimmel had $450,000 of his own money invested in Sure Line;

    d.   That the First Baptist Church of Hammond and Pastor Schaap had invested $1,000,000.00 in Sure Line;

    e.   That Mr. Kimmel would not receive any commission or payment from Mr. Elwell's investment in Sure Line; and

    f.   That Sure Line was a Collateralized Note Program that held a two-to-one collateral ratio for each dollar invested.

**ANSWER:     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, including all of its sub-parts, a. through f.**

11

33.   As a member of the First Baptist Church of Hammond, Mr. Elwell often counseled with Pastor Schaap regarding personal and spiritual matters, as well as financial matters.

**ANSWER:   Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

34.   In or about December 2006, Mr. Elwell spoke with Pastor Schaap regarding Mr. Elwell's recent September 2006 wedding and marriage to his wife, combining their financial assets.

**ANSWER:   Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

35.   During said counseling, Pastor Schaap, advised Mr. Elwell that he should discuss his financial and investment concerns with Mr. Kimmel, who had been hired by the Defendant to handle such matters.

**ANSWER:   Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

36.   Pastor Schaap further stated that Mr. Elwell should trust Mr. Kimmel and do whatever he advised regarding Mr. and Mrs. Elwell's finances, including investing in Sure Line.

**ANSWER:   Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

37.   At all times relevant, Pastor Schaap failed to inform Mr. Elwell that Pastor Schaap received a referral fee of one percent (1%) of every investment that he referred to Mr. Kimmel.

**ANSWER:**   Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegation of this paragraph.

38.     Relying upon the advice of Pastor Schaap and the representations of Mr. Kimmel, in or about December 2006, Mr. and Mrs. Elwell decided to consolidate their finances and invest in Sure Line.

**ANSWER:**   Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

39.     On or about January 2, 2007, Mr. and Mrs. Elwell executed a document entitled, "Collateralized Loan Agreement," and returned it to Sure Line along with a check in the sum of $160,000.00 for a Sure Line Investment.

**ANSWER:**   Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and demands strict proof of the written instrument.

40.     Mr. and Mrs. Elwell regularly received payments represented as "interest" payments on that investment between February 2007 and October 2009 leading them to believe that their money was in a legitimate investment and earning them interest.

**ANSWER:**   Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

41.     In or about October, 2009, Mr. and Mrs. Elwell tendered an additional $65,000.00 to Mr. Kimmel for a second Sure Line Investment. Mr. Kimmel reaffirmed his previous representations to the Elwells concerning the Sure Line Investments at that time.

**ANSWER:**   Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

42.     From October 2009 through December 2011, Mr. and Mrs. Elwell regularly received payments represented as "interest" payments on their investments, leading them to believe that their investments were legitimate and they were, in fact, earning interest.

**ANSWER:     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

### *Ms. Baldwin's Investments*

43.     Ms. Baldwin moved to Crown Point, Indiana in 2003 after her first husband died in a helicopter crash while he was serving in the U.S. Air Force. That same year, she began attending First Baptist Church with her two sons, WM and AM.

**ANSWER:     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

44.     As a result of her first husband's untimely passing, Ms. Baldwin had received life insurance proceeds that she hoped would enable her to take care of her two children.

**ANSWER:     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

45.     Ms. Baldwin regularly attended church services conducted by Pastor Schaap. She regularly heard Pastor Schaap encourage parishioners from the pulpit to attend finance classes taught by Mr. Kimmel, set appointments with Mr. Kimmel for financial advice, and invest through Mr. Kimmel.

**ANSWER:   Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

46.     In late 2007, Ms. Baldwin met with Pastor Schaap in his capacity as pastor of First Baptist Church. During that meeting, Ms. Baldwin asked Pastor Schaap for guidance

because she had money to invest and did not know where to turn. Pastor Schaap directed her

to Mr. Kimmel as the person hired by Defendant to teach and advise parishioners on finance,

budgeting, debt management and investing.

**ANSWER:**   **Defendant is without knowledge or information sufficient to form a**
**belief as to the truth of the allegations of this paragraph.**

47.     Ms. Baldwin placed trust and confidence in Pastor Schaap as her Pastor, a part

of the church she attended, and what she considered to be the church family that she grew to

know from a time when she was a widow with two small children.

**ANSWER:**   **Defendant is without knowledge or information sufficient to form a**
**belief as to the truth of the allegations of this paragraph.**

48.     Ms. Baldwin placed trust and confidence in Mr. Kimmel because he was

repeatedly endorsed by Pastor Schaap, his family was grounded in the church, he was a deacon,

and he was working for First Baptist Church when providing her financial advice, investment

advice and debt counseling.

**ANSWER:**   **Defendant is without knowledge or information sufficient to form a**
**belief as to the truth of the allegations of this paragraph.**

49.     In January 2008, Ms. Baldwin began attending Mr. Kimmel's classes through

First Baptist Church that were offered to its parishioners on church premises.

**ANSWER:**   **Defendant is without knowledge or information sufficient to form a**
**belief as to the truth of the allegations of this paragraph.**

50.     During those classes, Mr. Kimmel would use the Bible to teach the class,

including Ms. Baldwin, the importance of being wise with money and would talk about the

Sure Line Investments. Mr. Kimmel would encourage the class to set individualized appointments with him at his First Baptist Church Office.

**ANSWER:** **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

51.    Ms. Baldwin set an appointment with Mr. Kimmel and met with Mr. Kimmel at his First Baptist Church Office in early 2008. At that initial appointment, Ms. Baldwin met with Mr. Kimmel about budgeting and financial management and they also discussed the possibility of Ms. Baldwin investing in Sure Line. Mr. Kimmel informed Ms. Baldwin that the investment would be a minimum of $25,000.00, but she did not make a decision to invest during that initial appointment.

**ANSWER:** **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

52.    Between January and August of 2008, Ms. Baldwin and her children became close with Mr. Kimmel and Mr. Kimmel's wife. The Kimmel's even visited Ms. Baldwin and her children at her home.

**ANSWER:** **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

53.    In April of 2008, Ms. Baldwin remarried to her now husband Robert Baldwin. After their wedding, Ms. Baldwin and Robert Baldwin decided to meet with Mr. Kimmel at his First Baptist Church Office to discuss their financial future and investments. They had that meeting in May 2008.

**ANSWER:** **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

54.     During the May 2008 meeting, Mr. Kimmel solicited the Baldwins to invest in Sure Line. In soliciting the Baldwins to invest in Sure Line, Mr. Kimmel made the following representations (hereafter, the "Solicitation of the Baldwins"):

      a. Investing with Sure Line was the best option to protect her money and money for her children;

      b. That Sure Line was a company located in North Carolina that operated car lots under the name of Automocion, and that Sure Line made loans and financed cars in the sub-prime market;

      c. That the corporate officers and managers of Sure Line were all Christian and were of like beliefs;

      d. That Mr. Kimmel had his own money invested in Sure Line;

      e. That the First Baptist Church of Hammond and Pastor Schaap had invested in Sure Line;

      f. That the Sure Line Investment was endorsed by Pastor Schaap;

      g. That Ms. Baldwin would earn 12% interest per year on the money invested;

      h. That Mr. Kimmel would not receive any commission or payment from Ms. Baldwin's investment in Sure Line; and

      i. That Sure Line was a Collateralized Note Program and Sure Line had the inventory to pay all the investors back all of their invested money.

**ANSWER:**    **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

55.     That day, after finishing the May 2008 meeting with Mr. Kimmel, the Baldwin's met with Pastor Schaap and informed him they had just met with Mr. Kimmel at his First Baptist Church Office.

**ANSWER:**   Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

56.   Based on Mr. Kimmel's representations in the May 2008 meeting, the Baldwins decided that investing in the Sure Line Investments was a safe option to protect their finances and Ms. Baldwin's children's financial future.

**ANSWER:**   Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

57.   In June 2008, the Baldwin's invested $25,000.00 in a Sure Line Investment through Mr. Kimmel. The investment was to provide interest payments each month at a rate of 12% per annum (hereafter, the "Baldwin's Initial Sure Line Investment").

**ANSWER:**   Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

58.   On September 11, 2008, Ms. Baldwin, as the custodian for her son WM, tendered $81,500.00 to Mr. Kimmel for a Sure Line Investment for the benefit of WM. That same day, Ms. Baldwin tendered an additional $81,500.00 to Mr. Kimmel for a Sure Line Investment for the benefit of her son AM. (hereafter, the "Childrens' Sure Line Investments").

**ANSWER:**   Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

59.   Shortly thereafter, the Baldwins increased the Childrens' Sure Line Investments to $103,700.00 each for a total of $207,400.00 and increased their Initial Sure Line Investment by adding another $50,000.00. However, in December 2008, the Baldwin's withdrew the additional $50,000.00 from their Initial Sure Line Investment to purchase a new home. That

"withdrawal" created the illusion and reasonable belief in the Baldwins that their money was, in fact, invested in Sure Line and safe.

**ANSWER:** **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

60. On September 11, 2009, the Baldwins entered into a $3,000.00 add-on to their Initial Sure Line Investment and tendered the funds to Mr. Kimmel. This brought the value of the Baldwin's Initial Sure Line Investment to $28,000.00.

**ANSWER:** **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

61. Mr. Kimmel ensured Ms. Baldwin that all the money invested would be safe and that Sure Line had plenty of inventory to act as collateral so that all investors could be paid if Sure Line ever ran into any problems.

**ANSWER:** **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

62. At no time during their Sure Line Investments did Mr. Kimmel or Pastor Schaap ever disclose that they received a financial benefit from the Baldwin's investments.

**ANSWER:** **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

63. In the years 2008, 2009, 2010 and 2011, the Baldwins received regular interest payments on the Baldwins' Initial Sure Line Investment and on the Childrens' Sure Line Investment.

**ANSWER:** **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

64.     In January 2012, Sure Line sent correspondence to the Baldwins informing that Sure Line was unable to make interest payments that month. At that time, the Baldwins were informed by Mr. Kimmel that the inability to pay had to do with new regulations under the Dodd-Frank Act. They were led to believe by Mr. Kimmel that everything else was fine and that their investment remained secured.

**ANSWER:**    **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

### *The Sureline Investment Scheme Falls Apart*

65.     Contrary to the representations made to the Elwells and the Baldwins in January 2012, Sure Line's inability to pay was not based on new government regulations but on a financial collapse precipitated by years of undisclosed and misrepresented financial problems and, more importantly, the theft of investor funds for use in a Ponzi Scheme orchestrated by Mr. Kimmel.

**ANSWER:**    **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

66.     By no later than January 2008, Mr. Kimmel was aware that Sure Line did not have the 2-to-1 collateral represented to investors and that the company was, in fact, losing money and in danger of going under. Mr. Kimmel did not disclose this information to Plaintiffs.

**ANSWER:**    **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

67.     By no later than June 2008, Mr. Kimmel knew that the money that he was obtaining from investors he solicited and sold Sure Line Investments to was actually being

used to make interest payments to prior investors. Mr. Kimmel did not disclose this information to Plaintiffs.

**ANSWER:   Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

68.   In truth, between 2006 and 2011, the Sure Line Investments were not backed by a two-to-one collateral ratio that allowed each dollar invested to be backed by more than one dollar of collateral. The combined assets of Sure Line were far less than the amount of collateral represented to investors, including Plaintiffs, from 2006 to 2011 and Mr. Kimmel had knowledge of this fact.

**ANSWER:   Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

69.   In order to hide the true state of the financial condition of Sure Line from 2006 to 2011, new money from new investors was used to repay past investors' principal and interest and pay undisclosed commissions to Pastor Schaap and Mr. Kimmel. These payments created the appearance that the investments were legitimate and generating revenue while creating a cycle where more and more investor money was needed to pay off the increasing interest payments. In short, investor funds were not being invested as represented, but were instead being used to pay off other duped victims of the scheme and conceal the scheme.

**ANSWER:   Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

70.    Ultimately, the scheme fell apart in January 2012 when there was not enough new investor money coming in to perpetuate the scheme and continue the illusion of legitimacy and profit.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

71.    In January of 2012, Sure Line went into a Court ordered receivership in Case No 12-CVS-125 in Craven County, North Carolina (the "Receivership Action"). On January 25, 2012, the Court entered an order in the receivership action appointing a receiver and enjoining and staying all persons seeking relief from Sure Line's assets, including Sure Line noteholders like Plaintiffs, from commencing or litigating any legal proceedings related to their Sure Line Investments that could, directly or indirectly, interfere with the Receiver's performance of his duties and the administration of Sure Line's assets (the "Stay Order").

**ANSWER:    Upon information and belief, admit.**

72.    At the onset of the Receivership Action, Plaintiffs had not been alerted of any potential fraudulent conduct and believed that they would be paid back through the Receivership Action. Taking the only reasonable course of conduct, Plaintiffs submitted proof of claim forms to the receiver in the Receivership Action in or about June 2012.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

73.    From June 2012 until receipt of a final distribution on or about April 8, 2015, Plaintiffs participated in the Receivership Action in an effort to recover their losses pursuant to the Stay Order. As of the date of the April 2015 distribution, the Stay Order had not been lifted in the Receivership Action.

**ANSWER:**   **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

74.   During the pendency of the Receivership Action, on August 21, 2013, Mr. Kimmel was indicted for his conduct in carrying out the Sure Line Ponzi Scheme. That indictment charged Mr. Kimmel for such acts as conspiracy to commit wire fraud and mail fraud relative to his sale and solicitation of the Sure Line Investments (the "Indictment").

**ANSWER:**   **Admit.**

75.   Around the time of the Indictment in late summer 2013, Ms. Baldwin took part in a conference call with the FBI investigator and prosecutor. During that call, Ms. Baldwin learned for the first time that Pastor Schaap and Mr. Kimmel had concealed from the Baldwin's that:

      a.  Pastor Schaap was receiving a 1% commission for each of the Baldwin's Sure Line Investments;

      b.  Mr. Kimmel was making a 10% commission on their Sure Line Investments; and,

      c.  25% of the funds they invested were taken off the top to pay commissions as soon as the Baldwin's tendered checks to Mr. Kimmel for their Sure Line Investments and their Childrens' Sure Line Investment.

**ANSWER:**   **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, including subparts a. through c.**

76.   Mr. Kimmel was tried for the alleged crimes from the Indictment in June 2014.

**ANSWER:**   **Admit.**

77.   It was not until Mr. Kimmel's criminal trial that Mr. and Mrs. Elwell learned

through testimony in June 2014 that:

      a. Pastor Schaap was receiving a 1% commission for each or their Sure Line Investments and the investments of other investors from First Baptist Church;

      b. Mr. Kimmel was making a 10% commission on their Sure Line Investments and the investments of other First Baptist Church parishioners;

      c. 25% of the funds they invested were taken off the top to pay commissions as soon as the Elwell's tendered checks to Mr. Kimmel for their Sure Line Investments.

**ANSWER:** **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, including subparagraphs a. through c.**

78.    It was not until testimony in Mr. Kimmel's criminal trial in June 2014 that the Baldwin's and the Elwell's learned:

      a. The representations concerning the collateral supporting the Sure Line Investments were false and that Sure Line did not have the collateral to support repayment of the Sure Line Investments;

      b. Mr. Kimmel had previously been served with a cease and desist order from the Alabama department of securities informing that the sale of the Sure Line Investments was the unlawful sale of unregistered securities;

      c. The Sure Line Investments were actually a Ponzi Scheme in which the funds from new investors were used to make payments to other investors as phony

"interest payments" to disguise the fact that the investment was illegitimate and conceal and perpetuate the fraudulent scheme;

d. An attorney for First Baptist Church had informed Pastor Schaap and Mr. Kimmel as early as 2007 that the Sure Line Investments were likely in contravention of Indiana law;

e. That the managers and officers of Sure Line were not Christians of like belief to Plaintiffs;

f. Mr. Kimmel did not actually have any personal investments in Sure Line; and,

g. First Baptist Church did not invest in Sure Line.

**ANSWER:** **Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

*Schaap and Kimmel Concealed the Scheme from Plaintiffs and Parishioners*

79.     Plaintiffs could not have learned of the truth of Pastor Schaap and Mr. Kimmel's actions, wrongdoing and the benefit conferred from that wrongdoing because Pastor Schaap and Mr. Kimmel deliberately concealed the truth of their scheme and omitted material facts from Plaintiffs by taking advantage of their positions of trust.

**ANSWER:   Defendant denies the allegations of this paragraph.**

80.     While acting as a fiduciary as Plaintiffs' pastor, Pastor Schaap omitted to inform Plaintiffs that he was receiving a 1% commission on the investments he encouraged them to make through Mr. Kimmel as the financial advisor employed by Defendant. Pastor Schaap equally omitted that he knew, as early as November 2007, that he and Mr. Kimmel, as agents of Defendant, should not have been soliciting and encouraging parishioners to purchase the Sure Line Investments as they were likely a violation of Indiana law.

**ANSWER:     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

81.     Mr. Kimmel stood in a position of superior knowledge to Plaintiffs as a seller of their Sure Line Investments and as their financial advisor. Plaintiffs reposed trust and confidence in Mr. Kimmel in that relationship.

**ANSWER:     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

82.     Mr. Kimmel abused that trust and confidence by omitting and deliberately concealing material facts from Plaintiffs including that:

        a.  Mr. Kimmel was receiving a 10% commission on their investments;

        b.  Pastor Schaap was receiving a 1% commission;

c. 25% of investor funds were being taken off the top as soon as their checks were handed over to Mr. Kimmel;

d. Sure Line was not actually a two-to-one collateralized investment; and,

e. Investor funds were not being used to invest as represented but were being used in a "robbing Peter to pay Paul" scheme in which their funds went to pay off previously duped investors.

**ANSWER:   Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, including sub parts a. through e.**

83.   Because Pastor Schaap and Mr. Kimmel, while acting in their capacity as agents or apparent agents of Defendant, concealed these facts through deception, Plaintiffs could not discover the true nature of the scheme and the harm they had suffered until it was revealed in testimony under oath at Mr. Kimmel's trial in June of 2014.

**ANSWER:   Defendant denies the allegations of this paragraph.**

84.   Defendant, through its agents Schaap and Kimmel, prevented Plaintiffs from obtaining the knowledge necessary to pursue a claim against Defendant.

**ANSWER:   Defendant denies the allegations of this paragraph.**

### Count I - Constructive Fraud

85.   Plaintiffs incorporate the allegations in paragraphs 1 through 84 above as though stated fully herein.

**ANSWER:   Defendant restates and re-alleges its responses to paragraphs 1-84 above, as though fully set forth herein.**

86.   At all times relevant, in carrying out their duties, Pastor Schaap and Mr. Kimmel acted as the agents or, in the alternative, as apparent agents of Defendant.

**ANSWER:**    **Defendant denies the allegations of this paragraph.**

87.    While acting as Defendant's agent and in the scope of his employment, Pastor Schaap would inform members of the church, including Plaintiffs, during his sermons and other church services that Mr. Kimmel was employed by Defendant as a financial advisor for the parishioners of the church.

**ANSWER:**    **Defendant denies the allegations of this paragraph.**

88.    Mr. Kimmel's actions in providing financial and investment advice, including advising Plaintiffs to invest in the Sure Line Investments, were incidental to his duties at First Baptist Church.

**ANSWER:**    **Defendant denies the allegations of this paragraph.**

89.    Mr. Kimmel's wrongful conduct originated in activities closely associated with his work at First Baptist Church and Defendant's employment of Mr. Kimmel empowered him and provided him the opportunity or the means to advise members of the church, including Plaintiffs, on the Sure Line Investments.

**ANSWER:**    **Defendant denies the allegations of this paragraph.**

90.    Mr. Kimmel's advice to Plaintiffs to invest in Sure Line was:

    a. Of the same general nature as his duties to provide financial advice, counseling on getting out of debt, and investment advice to parishioners; and

    b. Intermingled with, and arising out of, his authorized duties to provide financial advice to members of First Baptist Church from his First Baptist Church Office.

**ANSWER:**    **Defendant denies the allegations of this paragraph, including sub parts a. and b.**

28

91.     Defendant, through its agents Schaap and Kimmel, owed a duty to Plaintiffs due to the relationship between the parties.

**ANSWER:     Defendant denies the allegations of this paragraph.**

92.     Pastor Schaap, as a pastor, had a fiduciary relationship with Plaintiffs and Plaintiffs reposed a special trust and confidence in Pastor Schaap. As a result of this trust and confidence, Pastor Schaap exercised influence over members of the First Baptist Church, including Plaintiffs.

**ANSWER:     The allegations of this paragraph state a legal conclusion, and as such, no answer is given.  To the extent an answer is required, Defendant denies the same.**

93.     Plaintiffs also imposed special trust and confidence in Mr. Kimmel as a Deacon of the First Baptist Church and as a financial advisor for members of the church. Due to the trust and confidence reposed in Mr. Kimmel by Plaintiffs, Mr. Kimmel enjoyed superiority and influence over Plaintiffs' decisions to invest in the Sure Line Investments and superior knowledge concerning the nature and truth of the Sure Line Investments.

**ANSWER:     To the extent the allegations of this paragraph are directed toward Defendant, they are denied.**

94.     Mr. Kimmel and Plaintiffs also had a relationship of seller and buyer in that Mr. Kimmel solicited and orchestrated the sales of, and Plaintiffs' purchases of, the Sure Line Investments. Due to Mr. Kimmel's role as a seller, he had a unique position of knowledge about the Sure Line Investments and a position of superiority over Plaintiffs' relative to the same.

**ANSWER:     To the extent the allegations of this paragraph are directed toward Defendant, they are denied.**

95. Defendant, through its agents Schaap and Kimmel, violated its duties to Plaintiffs by the making of false or material misrepresentations of past or existing facts or by remaining silent when a duty to speak existed.

**ANSWER:** **Defendant denies the allegations of this paragraph.**

96. Defendant, through its agent Mr. Kimmel, made misrepresentations to Plaintiff in the Sure Line Investment Representations, the Solicitation of the Elwells and the Solicitation of the Baldwins identified above.

**ANSWER:** **Defendant denies the allegations of this paragraph.**

97. Defendant, through its agents Pastor Schaap and Kimmel remained silent and omitted material information from Plaintiffs, including that:

    a. Pastor Schaap was receiving a commission on all of their Sure Line Investments;

    b. Mr. Kimmel was receiving a commission on all of their Sure Line Investments;

    c. 25% of each investor's funds were being taken off the top to pay commissions as soon as each investor's check was turned over to Mr. Kimmel;

    d. They had been advised that the Sure Line Investments were likely a violation of Indiana law; and,

    e. Mr. Kimmel was not actually licensed to provide financial advisory services or act as a seller of securities.

**ANSWER:** **Defendant denies the allegations of this paragraph, including sub parts a. through e.**

98.    Defendant, through its agent Mr. Kimmel, omitted additional material facts and remained silent on material facts known to him including that the Sure Line Investments were not backed by a two-to-one collateral ratio and that investor funds were not actually being invested, but were instead being used in a Ponzi Scheme to pay off other investors.

**ANSWER:    Defendant denies the allegations of this paragraph.**

99.    Plaintiffs relied on the actions of Defendant's agents and the representations and omissions of Defendant's agents in that they invested hundreds of thousands of dollars in the Sure Line Investments.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

100.    Plaintiffs suffered injury as a result of their reliance upon Defendant's actions, representations and omissions.

**ANSWER:    Defendant denies the allegations of this paragraph.**

101.    Defendant, through its agents Schaap and Kimmel, gained an advantage to the expense of Plaintiffs by receiving large, undisclosed commission payments and kickbacks from the Sure Line Investments. Pastor Schaap and Mr. Kimmel even specifically promoted the investment as a means to allow parishioners to make more money to be able to provide to First Baptist Church.

**ANSWER:    Defendant denies the allegations of this paragraph.**

WHEREFORE, Defendant prays this Court dismiss Plaintiffs' Complaint in its entirety, with prejudice, for fees and costs associated with this litigation, and for all other relief that this Court deems necessary and proper.

### Count II – Fraud

31

102.   Plaintiffs incorporate the allegations in paragraphs 1 through 84 above as though stated fully herein.

**ANSWER:    Defendant restates and re-alleges her responses to paragraphs 1-84 and 85-101 above, as though fully set forth herein.**

103. At all times relevant, in carrying out their duties, Pastor Schaap and Mr. Kimmel acted as the agents or, in the alternative, as apparent agents of Defendant.

**ANSWER:    Defendant denies the allegations of this paragraph.**

104. While acting as Defendant's agent and in the scope of his employment, Pastor Schaap would inform members of the church, including Plaintiffs, during his sermons and other church services that Mr. Kimmel was employed by Defendant as a financial advisor for the parishioners of the church.

**ANSWER:    Defendant denies the allegations of this paragraph.**

105. Mr. Kimmel's actions in providing financial and investment advice, including advising Plaintiffs to invest in the Sure Line Investments, were incidental to his duties at First Baptist Church.

**ANSWER:    Defendant denies the allegations of this paragraph.**

106. Mr. Kimmel's wrongful conduct originated in activities closely associated with his work at First Baptist Church and Defendant's employment of Mr. Kimmel empowered him and provided him the opportunity or the means to advise members of the church, including Plaintiffs, on the Sure Line Investments.

**ANSWER:    Defendant denies the allegations of this paragraph.**

107. Mr. Kimmel's advice to Plaintiffs to invest in Sure Line was:

a.  Of the same general nature as his duties to provide financial advice, counseling on getting out of debt, and investment advice to parishioners; and,

b.  Intermingled with, and arising out of, his authorized duties to provide financial advice to members of First Baptist Church from his First Baptist Church Office.

**ANSWER:**   **Defendant denies the allegations of this paragraph, including sub parts a. and b.**

108. Defendant, through its agent Mr. Kimmel, made material misrepresentations of past or existing facts that were false, including the Sure Line Investment Representations, the Solicitation of the Elwells and the Solicitation of the Baldwins.

**ANSWER:**   **Defendant denies the allegations of this paragraph.**

109.  Defendant, through its agent Mr. Kimmel, made these statements with knowledge or reckless ignorance of their falseness.

**ANSWER:**   **Defendant denies the allegations of this paragraph.**

110.  Defendant, through its agents Pastor Schaap and Mr. Kimmel also omitted material facts within their knowledge that were necessary to render other statements made not misleading including facts concerning the commissions received; Mr. Kimmel's licenses and qualifications; and, their knowledge that the Sure Line Investments likely stood in violation of Indiana law.

**ANSWER:**   **Defendant denies the allegations of this paragraph.**

111.  Plaintiffs relied on the omissions, false statements and material representations of past or existing facts to their detriment and invested hundreds of thousands of dollars in the

33

Sure Line Investments pursuant to the advice of Defendants' agents, Mr. Kimmel and Pastor Schaap.

**ANSWER:   Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

112.   As a proximate cause of Plaintiffs' reliance on Defendant's false statements and omissions, Plaintiffs have suffered injury.

**ANSWER: Defendant denies the allegations of this paragraph.**

WHEREFORE, Defendant prays this Court dismiss Plaintiffs' Complaint in its entirety, with prejudice, for fees and costs associated with this litigation, and for all other relief that this Court deems necessary and proper.

### Count III - in the alternative - Negligent Retention

**Defendant makes no answer to paragraphs 113 through 126 of Count III as it is the subject of Defendant's Rule 12(b)(6) motion to dismiss, which is being filed concurrently with this Answer and Affirmative Defenses.**

### AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE
### (State Comparative and Contributory Negligence Law)

As to the Plaintiffs' state law claims, to the extent that any injury or damages claimed by the Plaintiffs against this Defendant was caused, in whole or in part, by negligent conduct of the Plaintiffs, even if the Defendant is liable for said damages, the total amount of damages to which the Plaintiffs would otherwise be entitled must be reduced by application of principles of comparative fault in proportion to the amount of the negligent, willful and wanton, and intentional conduct of the Plaintiff, which was the proximate cause of her injuries.

In addition, at the time of the actions alleged in the Plaintiffs' Complaint, Indiana Code § 34-51-2-5 was in effect and reduces the Plaintiffs' recovery according to their contributory negligence. Further, Indiana Code § 34-51-2-6 was in effect at the time of the actions alleged in the Plaintiffs' Complaint which bars their recovery entirely when a Plaintiffs is found to be more than 50% of the proximate cause of the injury or damages for which recovery is sought.

## SECOND AFFIRMATIVE DEFENSE
### (Nonparty Defense)

As to the Plaintiffs' state law claims, to the extent that any injury or damages were sustained by the Plaintiffs, they were not caused in whole or in part by any acts of negligent by this Defendant, but instead were caused in whole or in part by actions of nonparty and/or third-parties, including but not limited to Sure Line Acceptance Corporation, Faithful Stewards, Inc. and Automocion, LLC, over whom this Defendant has no control.

Upon information and belief, the investment scheme as alleged in the Plaintiffs' Complaint consisted of a collateralized note program whereby investors would allegedly purchase collateralized notes originating from "sub-prime" automobile loans. The collateralized note program was devised, marketed and sold through Sure Line Acceptance Corporation from automobile sales made by Automocion, LLC. Upon information and belief, Mr. Kimmel utilized his company, Faithful Stewards, Inc., as a vehicle to offer investment advice and solicit investments in the Sure Line collateralized note program to various individuals and organizations throughout the country.

## THIRD AFFIRMATIVE DEFENSE
### (Mitigation of Damages)

Defendant is not liable to Plaintiffs for their alleged damages they sustained due to the Plaintiffs own failure to mitigate damages, including but not limited to their failure to properly

investigate, research and vet the risks and costs associated with their alleged investments with the Sure Line Acceptance Corporation. To the extent the Plaintiffs could have prevented injury or mitigated such injuries by taking reasonable actions under the circumstances, Plaintiffs should not be awarded damages for that injury. *Smith v. Rowe*, 761 F.2d 360, 366 (7th Cir. 1985). Accordingly, any verdict or judgment obtained by the Plaintiffs must be reduced by application of the principle that Plaintiffs have a duty to mitigate their damages, commensurate with the degree of failure to mitigate attributed to the Plaintiffs by a jury in this case.

**FOURTH AFFIRMATIVE DEFENSE**
**(Assumption of Risk)**

Plaintiffs incurred the risk of the alleged investment activities by knowingly investing their own money in a private investment transaction that this Defendant had no knowledge of nor any participation in, and Plaintiffs knew or should have known that a risk of financial loss was a possibility.

Defendant reserves the right to supplement these affirmative defenses as more information becomes available through the litigation in this matter.

Defendant requests judgment in its respective favor and against the Plaintiffs on all counts and claims in the Plaintiffs' Complaint, and for dismissal of this cause with prejudice and costs, and any other relief that this Honorable Court deems necessary and proper.

**<u>JURY DEMAND</u>**

Defendant demands a trial by jury.

Respectfully submitted,

/s/ Rick Hammond
One of the Attorneys for the Defendant

36

Rick Hammond
Bridget Liccardi
David Albaugh
HEPLERBROOM, LLC
30 N. LaSalle Street, Suite 2900
Chicago, Illinois 60602
(312) 205-7719
rick.hammond@heplerbrooom.com
david.albaugh@heplerbroom.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing(s) to the following: **John S. Burke** of Higgins & Burke, P.C., *Attorney for Plaintiffs*.  A courtesy copy was e-mail to:

John S. Burke
Higgins & Burke, P.C.
2560 Foxfield Rd. Suite 200
St. Charles, IL 60174
Phone No. (630) 762-9081
Fax No. (630) 762-9084
jburke@higginsandburke.com


*/s/ Rick Hammond*