### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF INDIANA - HAMMOND DIVISION

| | | |
|---|---|---|
| JOSEPH ELWELL, CRYSTAL ELWELL, | ) | |
| DEBORAH BALDWIN, Individually and as | ) | |
| custodian for her minor children, WM and | ) | |
| AM, and ROBERT BALDWIN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 2:16-CV-158 |
| v. | ) | |
| | ) | Hon. James T. Moody |
| FIRST BAPTIST CHURCH OF HAMMOND, | ) | Mag. Judge Andrew Rodovich |
| INDIANA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS

NOW COME Plaintiffs Joseph Elwell, Crystal Elwell, Deborah Baldwin, individually and on behalf of her minor children WM and AM, and Robert Baldwin (collectively, "Plaintiffs"), and for their Response to Defendant First Baptist Church of Hammond, Indiana, Inc.'s ("First Baptist") Motion to Dismiss (the "Motion"), state as follows:

### INTRODUCTION

This is a case about securities fraud committed by Thomas Kimmel ("Mr. Kimmel") , who was hired by First Baptist to serve as a financial counselor, and who used his position to sell to Plaintiffs fraudulent promissory notes made by Sure Line Acceptance Corporation ("Sure Line," the notes are referred to herein as the "Sure Line Notes"). Plaintiffs do not allege that Mr. Kimmel's solicitations are a part of First Baptist's religious doctrine.

First Baptist now brings this Motion, arguing that the Court lacks jurisdiction to decide this case because it would interfere with First Baptist's religious freedom. First Baptist's Motion cites generally the ecclesiastical abstention doctrine, but fails to allege application of the law to

the facts of this case. To establish application of the ecclesiastical abstention doctrine to this case, First Baptist would need to argue that (1) part of First Baptist's church doctrine is providing investment advice to its members; (2) Mr. Kimmel is one of its investment-advisory-ministers, and (3) one of Mr. Kimmel's ministerial activities was soliciting sales of the Sure Line Notes from Plaintiffs, other members of First Baptist, and others from all over the country. First Baptist fails to provide any basis for claiming that its church doctrine is involved in the sale of the Sure Line Notes, nor any basis that Mr. Kimmel was its minister, and acting in his capacity as such, when he was selling the Sure Line Notes to his victims, including Plaintiffs.

First Baptist's argument turns the ecclesiastical abstention doctrine on its head, and attempts to cast its fraudulent conduct (and that of its agents) in terms of religious freedom, thereby shielding itself from justice. Granting First Baptist's Motion would allow religious organizations to perpetrate fraudulent schemes against their members, then claim immunity under the First Amendment when the defrauded members attempt to recover. The ecclesiastical abstention doctrine does not apply to the facts of this case. The Court should deny the Motion.

## ARGUMENT

First Baptist makes two arguments why the Court should dismiss this case. First, First Baptist contends that the Court lacks jurisdiction to decide this case because it involves application or review of religious doctrine. Second, the Court cannot adjudicate the consequence of Mr. Kimmel's employment with First Baptist because of the ministerial exception.

As stated in more detail below, there are two reasons why the Court should deny First Baptist's Motion. First, First Baptist raises issues that are properly considered as affirmative defenses, which should not be ruled upon in a Rule 12(b)(1) Motion. Second, the ecclesiastical abstention doctrine does not apply in this case because Plaintiffs do not ask the Court to review internal church decision making or interpret religious doctrine, and First Baptist fails to explain

how Plaintiffs' allegations about Mr. Kimmel render him a minister, such that he can enjoy
immunity for his illegal conduct.

**I.      As applied to this case, the Ecclesiastical Abstention Doctrine operates as a
         potential affirmative defense to liability, not a jurisdictional bar**

The crux of First Baptist's Motion to Dismiss is that this Court does not have subject
matter jurisdiction to hear this case. First Baptist asserts that the ecclesiastical abstention doctrine
operates as a jurisdictional bar for this Court. For support, First Baptist cites a recent case from
the District Court for the District of Columbia, which decided, without analysis, that Rule
12(b)(1), not 12(b)(6) or 12(c), is the proper Rule to determine a challenge pursuant to the
ecclesiastical abstention doctrine. *See* Def. First Baptist Church of Hammond, Ind., Inc.'s Mem.
Law Supp. Mot. Dismiss (the "Mem.") at 5, ECF No. 71 (quoting *Gregorio v. Hoover*, Case No.
16-CV-782 (EGS), 2017 WL 780784, *4 (D.D.C. Feb. 28, 2017)). But the Seventh Circuit holds
that such an approach is incorrect. The Seventh Circuit explains that Rule 12(b)(1) is:

> intended for cases that are not within the jurisdiction of the district court. Now it is
> true and important that federal courts, as we noted in the *Tomic* case, do not have
> jurisdiction to decide ecclesiastical controversies. A federal court could not entertain
> a suit to restore the Latin mass or to declare Christian Science a heresy. But it does
> have jurisdiction to decide cases brought to enforce the Fair Labor Standards Act.
> The fact that enforcement of the Act in a particular case would entangle the court in
> an ecclesiastical controversy would be a compelling reason to dismiss that case, but
> not a reason founded on a lack of jurisdiction over a plaintiff's claim that, as in this
> case, is based on the Fair Labor Standards Act rather than on anything to do with
> religion. *Jurisdiction is determined by what the plaintiff claims rather than by what
> may come into the litigation by way of defense.*

*Schleicher v. Salvation Army*, 518 F.3d 472, 478 (7th Cir. 2008) (internal citations omitted)
(emphasis added). In this case, Plaintiffs complain that First Baptist's agents lied to Plaintiffs
about promissory notes offered by Sure Line. Plaintiffs' Complaint does not ask this Court to
interpret religious doctrine or proclaim if a member of a religion has adhered to the tenets of his
or her faith. While the free-exercise clause may provide a defense to liability, the Court must

determine if the facts of this case give rise to application of the doctrine. Such a determination requires the Court to exercise jurisdiction over this case. The Court should deny First Baptist's Motion and resolve this case on its merits.[1]

## II.   Doctrines rooted in the Free-Exercise Clause are inapplicable to this case

Even if this Court finds that application of the ecclesiastical abstention doctrine is properly before the Court, that doctrine and its related doctrine, the ministerial exception doctrine, do not apply to this case. As explained in more detail below, the ecclesiastical abstention doctrine is inapplicable to this case because the Court will not need to interpret religious doctrine to determine if Mr. Kimmel acted in this scope of his agency relationship when he defrauded Plaintiffs in connection with their purchase of Sure Line Notes. The ministerial exception is inapplicable to this case because (1) Mr. Kimmel is not a minister and (2) the ministerial exception doctrine only applies to matters arising under federal employment discrimination laws.

### A.   The ecclesiastical abstention doctrine does not apply because the case can be resolved by applying neutral principles of secular law

This Court can resolve Plaintiffs' Complaint on the merits because its adjudication will not involve interpretation of religious doctrine or review of internal church procedures. The ecclesiastical abstention doctrine proscribes courts from applying or interpreting religious doctrine to disputes involving church property, polity, or administration. *See Serbian E.*

---

[1] In addition, substantive Indiana law treats challenges under the free-exercise clause as affirmative defenses, not jurisdictional bars. *See Brazauskas v. Fort Wayne-S. Bend Diocese, Inc.*, 796 N.E.2d 286, 290 (Ind. 2003). Pursuant to the *Erie* doctrine, this Court should apply Indiana law and require such challenges to be pleaded as affirmative defenses. *See Cities Serv. Oil Co. v. Dunlap*, 308 U.S. 208, 212 (1939) (applying *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), and holding that the "question of how and by whom the facts shall be shown to the court" relates to a "substantial right upon which the [plaintiff] may confidently rely"), *cited with approval in Am. Dredging Co. v. Miller*, 510 U.S. 443, 454 (1994) ("For many years, however, it [the burden of proof] has been viewed as a matter of substance.").

*Orthodox Diocese for the U.S. of Am. & Can. v. Milivojevich*, 426 U.S. 696, 710 (1976)

["*Milivojevich*"]. Thus, when a defrocked bishop sued his church for alleged improprieties during

the church's ecclesiastical tribunal, the *Milivojevich* Court held that the free-exercise clause of

the Constitution prohibited courts from reviewing the ecclesiastical tribunal's decision and

procedural fairness. *See id.* at 724-25.

The *Milivojevich* Court's proscription, however, did not foreclose all cases that raise the

issue of religious freedom. Subsequent Supreme Court opinions limited *Milivojevich*'s holding

only to matters that involve application or interpretation of religious doctrine. *See Hosanna-*

*Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 190 (2012) (citing *Emp't*

*Div. Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 877 (1990) (holding state law

outlawing use of Peyote constitutional, even when used for religious purposes, because it is a

neutral law of general applicability). The *Hosanna-Tabor* Court distinguished the Court's ability

to decide issues of outward physical acts (like those present in *Smith*) from issues involving "an

internal church decision that affects the faith and mission of the church itself." *See Hosanna-*

*Tabor*, 565 U.S. at 190. In other words, as stated by the Seventh Circuit:

> [T]he sole inquiry is whether the individual has engaged in conduct that the state has
> deemed harmful. Indeed, a great deal of the activity of religious institutions falls
> within this category. Although such activity is motivated by the tenets of the religion,
> evaluation of that activity does not require that those religious tenets be assessed by
> the civil courts. For instance, many religions maintain hospitals and schools. The
> motivation for maintaining those institutions is clearly rooted in the faith
> commitment of the sponsoring church. However, whether a school adheres to safety
> standards or a hospital to medically acceptable standards of care hardly requires that
> the court examine and adjudicate matters of religious doctrine. Indeed, today,
> religious groups offer their adherents, and sometimes the entire community, services
> that were not offered by ecclesiastical sources in the past. *Few would doubt, however,*
> *that a lawyer practicing in a legal clinic operated by a church or a physician*
> *practicing in a clinic under church auspices would have to comply with the same*
> *standards of professional care and responsibility as any other law firm or medical*
> *facility.*

*Dausch v. Rykse*, 52 F.3d 1425, 1433 (7th Cir. 1994) (emphasis added). In sum, if the court can

resolve the issues presented in the case without interpreting or endorsing religious doctrine, the case falls outside the scope of the ecclesiastical abstention doctrine and should be decided on the merits.

In every case cited by First Baptist that applied the ecclesiastical abstention doctrine, the court dismissed the case because the court was asked to either (1) interpret religious doctrine or (2) review an internal church deliberation. *See, e.g.*, *Erdman v. Chapel Hill Presbyterian Church*, 286 P.3d 357, 370 (Wash. 2012) (declining to review ecclesiastical tribunal's decision that was based upon "church doctrine, policies, and religious beliefs"); *Ginyard v. Church of God in Christ Ky. First Jurisdiction, Inc.,* 6 F. Supp. 3d 725, 729 (W.D. Ky. 2014) (same); *Young v. N. Ill. Conf. of United Methodist Church*, 21 F.3d 184, 187 (7th Cir. 1994) (same); *Klouda v. Sw. Baptist Theological Seminary*, 543 F. Supp. 2d 594, 612 (N.D. Tex. 2008) (same); *First Baptist Church of Glen Este v. State of Ohio*, 591 F. Supp. 676, 683 (S.D. Ohio 1983) (same); *Klagsbrun v. Va'ad Harabonim of Greater Monsey*, 53 F. Supp. 2d 732, 741 (D.N.J. 1999) (declining to decide defamation case that would require court to conduct an impermissible inquiry into religious doctrine and discipline to decide if false statement was injurious to the plaintiff's reputation), *aff'd*, 263 F.3d 158 (3d Cir. 2001); *Drevlow v. Lutheran Church, Mo. Synod*, 991 F.2d 468, 471, 472 (8th Cir. 1993) (dismissing part of case that required court to interpret church bylaws, but allowing part of case to proceed that did not implicate issues that might entangle the court in a religious controversy); *House of God Which is Church of Living God The Pillar & Ground of Truth Without Controversy, Inc. v. Campbell*, Case No. 3:06-CV-66, 2008 WL 701585, *6 (M.D. Tenn. Mar. 13, 2008) (dismissing case that asked court to determine whether defrocked bishop violated religious decrees); *Gregorio*, 2017 WL 780784, *6 (allowing case to proceed in part because "[a]n assessment of whether [defendant church] *deemed* conveyance of its property to [plaintiff church] necessary or convenient for its religious purpose is a neutral

determination that would not involve the Court in determining what the Church's religious principles actually are."); *In re Godwin*, 293 S.W.3d 742, 749, 750 (Tex. App. 2009) (dismissing defamation and fraud claims because they implicated "the autonomy of the church to decide matters of internal church discipline and governance"); *Davis v. William*, 774 S.E.2d 889, 893 (N.C. Ct. App. 2015) (dismissing case that would require court to determine propriety of ecclesiastical decisions concerning church management and use of funds); *Robinson v. Freedom Faith Missionary Baptist Church*, 2004-Ohio-2607 ¶ 29 (Ohio Ct. App. 2004) (dismissing case where court would have to determine whether the pastor should be removed for breaching a duty to his church); *Mammon v. SCI Funeral Servs. of Fla., Inc.*, 193 So. 3d 980, 985 (Fla. Dist. Ct. App. 2016) (dismissing case where court would need to determine "'Jewish burial customs and traditions'" in fraudulent misrepresentation suit).

In its Motion, First Baptist makes three arguments regarding application of the ecclesiastical abstention doctrine to this case. First, First Baptist argues that the ecclesiastical abstention deprives the Court to hear *any* claims of fraud or financial misconduct against a church. *See* Mem. at 9-11. Second, First Baptist argues that the case should be dismissed because Plaintiffs purchased their Sure Line Notes for religious reasons and pursuant to religious principles. *See id.* at 12. Third, First Baptist argues that the case should be dismissed because First Baptist's alleged dispute resolution system precludes further review by the Court. *See id.* at 15.

As explained in more detail below, First Baptist's arguments are wrong. First, courts must decide fraud cases involving a church as long as the court is not required to inquire into religious doctrine. Second, Plaintiffs purchased their Sure Line Notes in reliance upon secular statements of fact. Third, any alleged dispute resolution procedure employed by First Baptist does not apply to Plaintiffs because there was no such system in place at the time of Mr. Kimmel's misconduct,

and Plaintiffs were no longer members of First Baptist as of the date when it allegedly adopted its bylaws.

> 1. **Ecclesiastical abstention only applies when the court is asked to interpret religious doctrine or review internal church procedures**

First Baptist argues that courts are powerless to decide cases involving a church and fraud. Contrary to First Baptist's position, however, courts are required to decide cases involving religious entities, provided the court can apply neutral principles of secular law to decide the case. While First Baptist cites cases that involved both churches and fraud, First Baptist fails to explain why *this case* requires the court to decide issues of religious doctrine. First Baptist's cited cases from foreign states are distinguishable. In *Davis*, *Godwin*, and *Robinson*, the Court dismissed the case because it would require a inquiry into how a church allocates and spends its donations. *See Davis*, 774 S.E.2d at 893; *Godwin*, 293 S.W.3d at 750; *Robinson*, 2004-Ohio-2607 ¶ 29. The fraud claims at issue in *Klouda* involved the plaintiff's termination without cause, after allegedly receiving representations that she was being hired for a tenure-track position and could only be terminated for poor performance. *Klouda*, 543 F. Supp. 2d at 612. The *Klouda* Court dismissed the case because "it is impossible to 'conceive how the federal judiciary could determine whether an employment decision concerning a minister was based on legitimate or illegitimate grounds without inserting [itself] into a realm where the Constitution forbids [it] to tread, the internal management of a church.'" *Id.* (quoting *Combs v. Cent. Tex. Annual Conf. of the United Methodist Church*, 173 F.3d 343, 350 (5th Cir. 1999)).

In contrast, the Seventh Circuit upheld a pastor's conviction for securities fraud, despite his argument that the First Amendment protects his ability to determine an appropriate use of his church's money. *United States v. Lilly*, 37 F.3d 1222, 1226 (7th Cir. 1994). In *Lilly*, the pastor-defendant was convicted for selling "certificates of deposit" to his church members, with the

representation that the proceeds would be used to improve or expand the church. *Id.* at 1224. In reality, however, Pastor Lilly used the proceeds to enrich himself and his family. *Id.* Rejecting his ecclesiastical-abstention argument, the *Lilly* Court noted that "Pastor Lilly does not maintain that the tenets of his religion require him to undertake securities fraud and that by outlawing securities fraud, the statutory provisions at 15 U.S.C. §§ 77q(a) and 77x impermissibly burden his First Amendment right to practice his religion freely." *Id.* at 1226. Accordingly, the *Lilly* Court held, "The district court's determination of the Pastor's guilt had absolutely nothing to do with reviewing the church's internal allocation of funds, nor did it implicate any issue of religious polity. Instead, Pastor Lilly's offense pertained solely to the way in which he procured the 'church' funds in the first place." *Id.*; *see also Drevlow*, 991 F.2d at 471-72 (allowing matter to proceed where church-defendant could not provide explanation for its allegedly defamatory conduct that could entangle court in religious controversy); *Gregorio*, 2017 WL 780784, *7 (allowing case to proceed that requires court to assess whether church in fact deemed conveyance of property necessary or convenience for religious purpose, because it would not require court to determine the propriety of that religious purpose).

Here, Plaintiffs complain that First Baptist retained Mr. Kimmel to provide financial counseling to its members. Plaintiffs complain further that Mr. Kimmel used his position as First Baptist's financial counselor as a platform to sell Sure Line Notes to Plaintiffs. Plaintiffs complain further that they relied on certain misrepresentations made by Mr. Kimmel in purchasing the Sure Line Notes. Specifically, Mr. Kimmel falsely represented that (1) Sure Lines's officers were all Christian, (2) he had $450,000 of his own money invested in Sure Line, (3) First Baptist and Pastor Schaap had $1,000,000 invested in Sure Line, (4) Pastor Schaap endorsed Sure Line, and (5) Mr. Kimmel would receive no commissions or payments from Plaintiff's Sure Line Note purchases. Compl. ¶ 20. Plaintiffs make no reference to any church

doctrine or scriptures in their complaint. First Baptist, moreover, does not argue that the tenets of its religious require its agents to sell Sure Line Notes using fraudulent means, and that by outlawing fraud and/or constructive fraud, Indiana (and by extension, this Court) impermissibly burden First Baptist's right to practice its religion freely. First Baptist fails to assert any burden on its right to practice its religion freely. Indeed, First Baptist fails to assert *any* religious doctrine that it believes is implicated in this case. Instead, First Baptist argues, without development, that deciding this case on the merits "would risk chilling religious freedom and expression." Mem. at 11. First Baptist cloaks itself in the Constitution, and argues that the First Amendment precludes wholesale the Court's inquiry into any aspect of the church. First Baptist's position is not supported by any of the cases it cited in its memorandum. The Court should deny First Baptist's Motion and allow this case to continue.

> **2.    The Court must decide this case on the merits because it does not need to apply religious doctrine to determine if Mr. Kimmel defrauded Plaintiffs**

This Court must resolve this case on the merits because such a resolution will not involve the application of religious doctrine to determine if Mr. Kimmel made misrepresentations of fact to Plaintiff, in connection with his solicitation of the Sure Line Notes. Claims for fraud and constructive fraud must be based upon, among other things, a false statement of fact. *See Heyser v. Noble Roman's, Inc.*, 933 N.E.2d 16, 19 (Ind. Ct. App. 2010) (fraud); *Kreighbaum v. First Nat'l Bank & Tr.*, 776 N.E.2d 413, 421 (Ind. Ct. App. 2002) (constructive fraud). Statements that cannot be proven true or false, such as opinions, cannot be fraudulent "unless the speaker disbelieves her own words." *See Decatur Ventures, LLC v. Daniel*, 485 F.3d 387, 391 (7th Cir. 2007) (citing *Kreighbaum*, 776 N.E.2d at 421). Accordingly, in cases involving allegedly false statements, courts will dismiss the claim if the court will be required to determine or interpret the truth or falsity of statements based upon matters of religious doctrine. *See Mammon*, 193 So. 3d

at 985 (dismissing fraud action where court would need to determine if funeral home observed "Jewish burial customs and traditions" because court would be required to first decide what constitutes those customs and traditions); *Klagsbrun*, 53 F. Supp. 2d at 741 (dismissing defamation action where suit would require court to ascertain whether the plaintiff "was in fact engaged in bigamy *within the meaning of the Orthodox Jewish faith*.").

Plaintiffs complain that Mr. Kimmel induced them to purchase Sure Line Notes based upon a series of lies. The Elwells complain that Mr. Kimmel told them the following lies: (1) the corporate officers of Sure Line were all Baptist Christians; (2) that Mr. Kimmel had $450,000 of his own money invested in Sure Line; (3) that First Baptist and Pastor Schaap invested $1,000,000.00 in Sure Line; (4) that Mr. Kimmel would not receive any commission or payment from their Sure Line Note purchases; and (5) that Sure Line was a Collateralized Note Program that held a two-to-one collateral ratio for each dollar invested. *See* Compl. ¶ 32. The Baldwins complain that Mr. Kimmel told them the following lies: (1) the corporate officers of Sure Line were all Baptist Christians; (2) that Mr. Kimmel had $450,000 of his own money invested in Sure Line; (3) that First Baptist and Pastor Schaap had invested in Sure Line; (4) that Pastor Schaap had endorsed the Sure Line Note program; (5) Mr. Kimmel would not receive any commission or payment from their Sure Line Note purchases; and (5) that Sure Line was a Collateralized Note Program that had sufficient inventory to pay all of the noteholders' principal back to them. *See id.* ¶ 54.

First Baptist argues in its Motion that two of the above representations preclude the Court from determining whether the remainder of the representations are false. In particular, First Baptist claims that, without resorting to interpretation of religious doctrine, the Court cannot determine the falsity of Mr. Kimmel's statements that (1) Sure Line's officers were all Christian and of like belief and (2) Pastor Schaap endorsed the Sure-Line-Note investment. Mem. at 13.

First Baptist concedes that the remainder of Mr. Kimmel's lies are sufficient to state a claim for fraud and constructive fraud. This concession, by itself, is sufficient grounds to deny the Motion.

Notwithstanding First Baptist's position, this Court can decide the truth or falsity of Mr. Kimmel's representations without applying religious doctrine. Regarding Mr. Kimmel's representation that Sure Line's officers were all Baptist Christians, First Baptist contends that "[t]he question of 'who is a Christian can generate an argument in serious circles across the country' and is a matter beyond the competence of federal courts. Mem. at 14 (quoting *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1265 (10th Cir. 2008) [hereinafter "*Weaver*"]). At issue in *Weaver* was a Colorado law that awarded scholarships to "sectarian" colleges while excluding "pervasively sectarian" colleges from scholarship grants. *Id.* at 1256. The Tenth Circuit held Colorado's law unconstitutional because it "expressly discriminates *among* religions, allowing aid to 'sectarian' but not 'pervasively sectarian' institutions, and it does so on the basis of criteria that entail intrusive governmental judgments regarding matters of religious belief and practice." *Id.*

This Court, however, will not need to inquire into religious beliefs to determine if Sure Line's officers are, in fact, Baptist Christians. The Supreme Court recognizes that courts have the ability to inquire into a person's claimed religious beliefs to determine if they are the product of an "honest conviction." *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2779 (2014) (citing *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 716 (1981) ("The narrow function of a reviewing court in this context is to determine whether there was an appropriate finding that petitioner terminated his work because of an honest conviction that such work was forbidden by his religion").

Based on the limited evidence in this case, Mr. Kimmel knew that the officers of Sure Line did not have an honest conviction that they were Baptist Christians. Jim Kirk ("Mr. Kirk"),

Sure Line's Chief Executive Officer, testified at Mr. Kimmel's criminal trial that he told Mr.

Kimmel that he was an agnostic, not a Baptist Christian. *See* Trial Testimony of James W. Kirk,

Jr. p. 23:25-24:1, Bates Nos. PUB010480-598, attached hereto and incorporated herein as

**Exhibit A**. In response, Mr. Kimmel told Mr. Kirk that he did not care whether Mr. Kirk "was

Christian or wasn't Christian, that he was concerned about getting paid for his work." *Id.* p. 24:4-

7. Mr. Kimmel acknowledged that the officers of Sure Line were of a different religion than

Plaintiffs or Mr. Kimmel. *See* Letter from Mr. Kimmel to Mr. Kirk, dated August 16, 2006, pp.

1-2, Bates Nos. PUB011525-26, attached hereto and incorporated herein as **Exhibit B**. In his

letter, Mr. Kimmel explained that:

> There are many places and conferences you just cannot go to or be a part of. That's
> not to say there is anything wrong with you or your company, it is just a fact of life.
> These church arenas, the arenas I travel in, are more restrictive than others to
> outsiders. The only way to penetrate them is with someone from within the group.

*Id.*; *see also* Trial Testimony of Thomas L. Kimmel, p. 89:2-90:2, Bates Nos. PUB010761-983,

attached hereto and incorporated herein as **Exhibit C** (acknowledging that "insiders" are

members of the independent Baptist movement). The Court's inquiry into this issue should focus

on the inconsistencies between what Sure Line's officers were telling Mr. Kimmel, and what Mr.

Kimmel was telling Plaintiffs. The Court will not need to delve deeper into religious doctrine;

the Court will only have to determine if the Sure Line officers had honest convictions that they

are Baptist Christians. Accordingly, the Court should reject First Baptist's argument to dismiss

the case on this issue.

Regarding Mr. Kimmel's representation that Pastor Schaap endorsed the investment, this

is also a representation that can be proven true or false. First Baptist asserts that "the question of

what it means for a Pastor to "endorse" an investment is a question of a religious nature, not

susceptible to an easy definition by a civil court." Mem. at 15. First Baptist concludes, without

analysis, that "the question of what it means for Pastor Schaap to 'endorse' Kimmel's biblical

financial classes is clearly rooted in religious belief." *Id.*

The word, "endorse," means, in relevant part, "to approve, support, or sustain." *See*

*Endorse*, Dictionary.com, *available at*: http://www.dictionary.com/browse/endorse (last accessed

Aug. 31, 2017). Contrary to First Baptist's contention, "endorse" is often used in a secular

context, such as when a newspaper endorses a political candidate. Using a word in a religious

context does not render interpretation of that word a religious exercise. Here, the factfinder will

need to decide if Pastor Schaap approved of, supported, or sustained the Sure Line Note program.

Such a determination will not require the Court to decide matters of religious belief. Either Pastor

Schaap approved of the program, or he did not. The Court will not be required to define religious

terms or determine questions of religious doctrine and practice to determine if Mr. Kimmel

defrauded Plaintiffs. First Baptist's Motion must be denied.

### 3. Any alleged dispute resolution procedure employed by First Baptist does not apply to Plaintiffs

This Court should reject First Baptist's argument that this litigation is, in reality, a civil

review of an ecclesiastical decision that is prohibited by the Supreme Court's decision in

*Milivojevich*. *See* Mem. at 15 (quoting *Milivojevich*, 426 U.S. at 724-25). First Baptist's

argument on this issue is only directed at Plaintiff Joseph Elwell ("Dr. Elwell").[2] As First Baptist

notes:

> The First Amendment permits "religious organizations to establish their own rules
> and regulations for internal discipline and government, and to create tribunals for
> adjudicating disputes over these matters." When a religious organization decides
> such a dispute, the "Constitution requires that civil courts accept their decisions as
> binding upon them." "All who unite themselves to such a [religious] body do so with
> an implied consent to this [ecclesiastical] government, *and are bound to it*." "[I]t
> would be a vain consent and would lead to the total subversion of such religious

---

[2] As First Baptist's argument is only directed at Dr. Elwell, Plaintiffs' Response will only
discuss the Church's argument as applied to Dr. Elwell.

beliefs, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed."

Mem. at 15-16 (quoting *Milivojevich*, 426 U.S. at 724-25, 711) (internal citations omittted).

While Plaintiffs agree that the above quote is an accurate statement of the holding in

*Milivojevich*, First Baptist's argument on this point suffers three fatal flaws. First, First Baptist

fails to state whether First Baptist rendered an ecclesiastical decision. At his deposition,

Administrative Pastor Eddie Lapina[3] ("Pastor Lapina") testified that First Baptist rejected Dr.

Elwell's offer to arbitrate his dispute with First Baptist:

> Q.    Do you recall if Joe Elwell asked Pastor Wilkerson for an arbitration meeting?
> **A.    Yes.**
> Q.    What as the result of that request?
> **A.    Pastor Wilkerson did talk to the officers of the Deacon Board, explained the situation, and they declined arbitration.**
> Q.    Part of the church's doctrine is resolving disputes internally; right?
> **A.    Yes, sir.**
> Q.    Why was that not followed in this case?
> **A.    They felt it was. There was no basis for arbitration. The church did not feel responsible in any way, shape, or form for this.**
> Q.    So it's not really that they did arbitrate. They chose not to pursue that path; is that right?
>        MR. HAMMOND:    You can answer.
> **A.    Yes.**

Deposition of Eddie Lapina pp. 129:15-30:8, attached hereto and incorporated herein as **Exhibit**

**D**. In contrast to the cases that First Baptist cites in its Motion, Dr. Elwell offered to arbitrate his

dispute, and that offer was rejected by First Baptist. Dr. Elwell's motivations for requesting an

arbitration, along with his belief of First Baptist's non-compliance with scripture, is not one of

---

[3] At his deposition, Pastor Lapina testified that he has been employed by First Baptist since  1981, and since 2005 "oversaw a lot of the church business, not 100 percent of it but most of – anything dealing with legal issues, contracts, building projects." Lapina Dep. pp. 11:14-15, 13:22-25. Accordingly, Pastor Lapina is competent to testify about First Baptist's rejection of Dr. Elwell's offer to arbitrate.

the issues before this Court. In every case cited by First Baptist, the decision was based on the fact that the plaintiff was asking for review of an ecclesiastical decision. There are no facts to support First Baptist's contention that it arbitrated the dispute, and that Dr. Elwell is claiming some procedural defect with the proceeding. Dr. Elwell does not ask the Court to review First Baptist's arbitral decision. Indeed, there is no decision to review.

Dr. Elwell's rejected offer to arbitrate cannot be transubstantiated into his consent to, and participation in, an arbitral proceeding. Dr. Elwell's lack of consent is evident in First Baptist's citation of his March 6, 2015 letter to First Baptist, in which he manifests his intent to seek outside court actions unless he receives a plan to resolve his complaint by March 16, 2015. *See* Mem. at 17 (quoting Dr. Elwell's Letter, dated March 6, 2015, attached to First Baptist's Motion as Exhibit D). There is no evidence that such a resolution was ever reached. As there is no ecclesiastical decision to review, this Court has the power to decide this case on the merits. First Baptist's Motion should be denied.

Second, First Baptist omits that crucial point that Dr. Elwell was no longer a member of First Baptist at the time that he unsuccessfully offered to arbitrate his dispute with First Baptist. In Dr. Elwell's deposition, he testified that he moved his membership to another church at some point from 2009 to 2011. *See* Deposition of Joseph Elwell p. 7:3-11 (attached to First Baptist's Motion as Exhibit A). Plaintiff's Complaint states that the Elwells have lived in Yuma, Arizona (over 1,600 miles away from Hammond, Indiana) since September 2009. *See* Compl. ¶ 1. Dr. Elwell sent his demand for arbitration to First Baptist on March 6, 2015, at least four years after he joined another church and was no longer a member of First Baptist.

First Baptist fails to provide any evidence that Dr. Elwell was a member of First Baptist on or after March 6, 2015. As First Baptist concedes, only those who have united themselves to the religious organization impliedly consent to the decisions of its government. *See Milivojevich*,

426 U.S. at 711. Here, Dr. Elwell left First Baptist four years before he unsuccessfully offered to arbitrate his dispute. Even if First Baptist's disregard of Dr. Elwell's offer could be considered an "ecclesiastical decision," Dr. Elwell did not consent to the decisions of First Baptist because he was no longer a member when he offered to arbitrate.

Third, First Baptist fails to discuss which, if any, of its bylaws apply to this case. While the Court cannot use religious doctrine to interpret a church's by-laws, *See Milivojevich*, 426 U.S. at 724-25, First Baptist has never produced any by-laws in this case, and fails to support its argument by attaching its by-laws (assuming they exist) to its Motion. Moreover, Administrative Pastor Eddie Lapina testified that First Baptist did not adopt any by-laws or written policies until 2013:

> Q.   When did the church adopt the bylaws originally?
> **A.   2013.**
> Q.   Prior to 2013 there were no bylaws of the church?
> **A.   No, not to my knowledge.**
> Q.   Were there any written policies of the church prior to 2013?
> **A.   No, sir.**

Lapina Dep. p. 97:17-25. According to Pastor Lapina, First Baptist adopted its bylaws and written policies after Dr. Elwell left First Baptist. There are no facts to support First Baptist's contention that Dr. Elwell consented to be bound by bylaws that did not exist at the time he left First Baptist. This case does not involve the Court's review of First Baptist's policies, decisions, or procedures. This case is about First Baptist's agent defrauding Plaintiffs due to Mr. Kimmel's lies about the Sure Line Notes. Accordingly, the Court has the power to decide this case on its merits, and must deny First Baptist's Motion.

> **B.   This case falls outside the ministerial exception because Plaintiffs do not allege that Mr. Kimmel is a minister, and the exception only applies to federal employment claims**

This Court should deny First Baptist's Motion and find that Plaintiffs can state a claim for

First Baptist's negligent retention of Mr. Kimmel. First Baptist argues that an affirmative defense related to the ecclesiastical abstention doctrine, the "ministerial exception," precludes this Court from determining whether First Baptist was negligent in their retention of Mr. Kimmel.

First Baptist argues that (1) Plaintiffs' allegations render Mr. Kimmel a minister of First Baptist, and (2) the ministerial exception doctrine bars claims of negligent retention against churches. As demonstrated in further detail below, neither argument has merit. First, First Baptist fails to explain how Plaintiffs' allegations about Mr. Kimmel render him a minister. Second, the ministerial exception doctrine only bars claims that implicate ecclesiastical decisionmaking in an employment decision. The Court must deny First Baptist's Motion.

### 1.      Plaintiffs' allegations do not render Mr. Kimmel a minister of First Baptist

Plaintiffs do not allege that Mr. Kimmel is a "minister" of First Baptist. The *Hosanna-Tabor* Court did not define "ministerial," and explicitly did not "adopt a rigid formula for deciding when an employee qualifies as a minister." *Hosanna-Tabor*, 565 U.S. at 190; *see also Alicea-Hernandez v. Catholic Bishop of Chi.*, 320 F.3d 698, 703 (7th Cir. 2003) "Our inquiry thus focuses on the 'function of the position' at issue and not on categorical notions of who is or is not a 'minister'" *Id.* (quoting *EEOC v. Roman Catholic Discese*, 213 F.3d 795, 801 (4th Cir. 2000)). As a threshold matter, the Supreme Court holds that the ministerial exception is an affirmative defense, not a jurisdictional bar. *Hosanna-Tabor*, 565 U.S. at 195 n.4 ("[T]he exception operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar."). "[T]he subsidiary determination of whether a discrimination plaintiff was a minister is both factual and case-specific." *Collette v. Archdiocese of Chi.*, 200 F. Supp. 3d 730, 733 (N.D. Ill. 2016). Plaintiffs note that First Baptist's Motion does not challenge the jurisdictional sufficiency of Plaintiffs' negligent retention claim, only that the claim cannot apply to this case. Accordingly, First Baptist's Motion to Dismiss for lack of jurisdiction to determine

the application of the ministerial exception should be denied.

The *Hosanna-Tabor* Court "offered four generic factors to consider when determining a ministerial employee." *See Kirby v. Lexington Theological Seminary*, 426 S.W.2d 597, 613 (Ky. 2014) (interpreting *Hosanna-Tabor*'s discussion). The *Kirby* Court parsed the following factors: "(1) the formal title given by the religious institution, (2) the substance reflected in that title, (3) [his] own use of the title, and (4) the important religious functions performed for the religious institution." *Kirby*, 426 S.W.2d at 613. The Seventh Circuit distinguishes the "judicial refusal to examine the pastoral activity of members of the clergy" with "situations in which the conduct in question does not bear such a direct relationship to the doctrinal or organizational aspects of religious practice." *Dausch*, 52 F.3d at 1433. ("Few would doubt, however, that a lawyer practicing in a legal clinic operated by a church or a physician practicing in a clinic under church auspices would have to comply with the same standards of professional care and responsibility as any other law firm or medical facility."). The Second Circuit refuses to apply the ministerial exception to cases that would not involve an examination of religious doctrine. *See, e.g.*, *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 172 (2d Cir. 1993) (allowing ADEA claim to proceed because trial court would be able to determine if the plaintiff was fired for his age or because of his failure to perform easily isolated and defined religious duties).

The *Hosanna-Tabor* Court held the plaintiff in that case was a minister because (1) her church held her out as a minister, (2) her church tasked her "with performing that office 'according to the Word of God and the confessional standards of the Evangelical Lutheran Church as drawn from the Sacred Scriptures,'" (3) she considered herself a minister, and took an allowance on her taxes that only applied to ministers, and (4) her job duties "reflected a role in conveying the Church's message and carrying out its mission," specifically "'lead[ing] others toward Christian maturity' and 'teach[ing] faithfully the Word of God, the Sacred Scriptures, in

its truth and purity and as set forth in all the symbolical books of the Evangelical Lutheran Church.'" *Hosanna-Tabor*, 565 U.S. at 191-92. Conversely, the Kentucky Supreme Court held that a seminary's professor of religious history was not a minister because (1) his title did not have any significance to the religious views of the seminary, (2) the substance of his "titles suggest[ed] an academic treatment of the study of religion," (3) he did not use his role to indicate that "he was a 'representative of the religious institution authorized to speak on church doctrine,'" and (4) he was a "'source of religious instruction' but did not play 'an important role in transmitting the [Seminary's] faith to the next generation." *Kant v. Lexington Theological Seminary*, 426 S.W.2d 587, 593-95 (Ky. 2014) (quoting *Sch. Dist. of Abington Tp., Pa. v. Schempp*, 374 U.S. 203, 306 (1963) (Goldberg, J., concurring); *Kirby*, 426 S.W.2d at 613-14; *Hosanna-Tabor*, 565 U.S. at 192).

Here, First Baptist argues, without explanation, that Plaintiffs' Complaint renders Mr. Kimmel a "minister" of First Baptist. For support, First Baptist cites to, but fails to explain the application of, Plaintiffs' allegations that (1) Mr. Kimmel was a deacon of First Baptist, (2) Mr. Kimmel had an office at First Baptist with his name on the door, (3) money invested with Mr. Kimmel would help First Baptist, (4) Mr. Kimmel would use the Bible to teach church members, and (5) the Church paid Mr. Kimmel to act as a financial advisor to its parishioners. *See* Mem. at 9 (citing Compl. ¶¶ 5, 10, 11, 13, 50, 93, and 117).

Applying *Hosanna-Tabor*'s factors (as parsed by the *Kirby* Court), First Baptist fails to meet its burden to show that Plaintiffs allege that Mr. Kimmel was a minister. Plaintiffs allege that First Baptist gave Mr. Kimmel the formal title of "financial advisor." This title has no religious connotation. First Baptist fails discuss the substance of Mr. Kimmel's role of a financial advisor, other than to conclude that it is a "'role distinct from that of most of [the church] members." First Baptist fails to argue the role of a "deacon," or why Mr. Kimmel's status as a

deacon has any bearing on this case. First Baptist fails to argue that Mr. Kimmel held himself out

as a minister, or that he was authorized by First Baptist to speak on matters of church doctrine.

First Baptist fails to argue how using the Bible to teach finances is anything more than a "source

of religious instruction" similar to the conduct of the history of religion professor in *Kant*. To

prove that Mr. Kimmel was one of its ministers, First Baptist would need to prove that providing

investment advisory services is a part of its core religious teachings, and that Mr. Kimmel's Sure

Line Note solicitations were to advance the investment-advisory branch of its ministry. First

Baptist fails to take this position. Indeed, First Baptist fails to delineate the extent of Mr.

Kimmel's ministry, if any, on behalf of First Baptist. In sum, First Baptist has pleaded an

affirmative defense, and must prove that defense affirmatively, not by using Plaintiffs'

allegations to avoid taking a definitive position on one of the main issues in this litigation. First

Baptist has not demonstrated that Plaintiffs fail to state a claim for negligent retention, and its

Motion should be denied.

> **2.      The ministerial exception only applies to ministers seeking
>           relief from their church pursuant to federal employment
>           discrimination laws**

The Supreme Court holds that the ministerial exception only bars suits by a minister-

employee against his church-employer on grounds of employment discrimination. *See Hosanna-*

*Tabor*, 565 U.S. at 196 ("We express no view on whether the exception bars other types of suits,

including actions by employees alleging breach of contract or tortious conduct by their religious

employers."). "The ministerial exception operates to exempt from the coverage of various

employment laws the employment relationships between religious institutions and their

'ministers.'" *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299, 306 (4th

Cir. 2004) (quoting *EEOC v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 800 (4th

Cir.2000)). In the Seventh Circuit, the ministerial exception only operates to bar federal

employment discrimination claims. *See Young*, 21 F.3d at 186; *see also Hosanna-Tabor*, 565

U.S. at 188 (holding that the ministerial exception "precludes application of such legislation

[federal employment laws] to claims concerning the employment relationship between a religious

institution and its ministers."). Courts created the ministerial exception because "'the Free

Exercise Clause protects the act of a decision rather than a motivation behind it.'" *See Alicea-

Hernandez*, 320 F.3d at 703 (quoting *Roman Catholic Diocese of Raleigh*, 213 F.3d at 802).

Without the ministerial exception to liability under the federal employment laws, courts would

become "enmesh[ed] . . . in endless inquiries as to whether each discriminatory act was based in

Church doctrine or simply secular animus." *Alicea-Hernandez*, 320 F.3d at 703.

In Indiana, the ministerial exception has only been applied to suits between a church and

one of its ministers. *See, e.g.*, *Ind. Area Conference of United Methodist Church, Inc. v. Snyder*,

953 N.E.2d 1174, 1180 (Ind. Ct. App. 2011) (affirming summary judgment in favor of church on

defamation claim brought by reverend); *Matthies v. First Presbyterian Church*, 28 N.E.3d 1109,

1114 (Ind. Ct. App. 2015) (affirming summary judgment in favor of church where court would

need to "determine what the duties of a pastor called to serve a local Session and congregation

entail and then decide whether the pastor's conduct met such standards."); *Ballaban v.

Bloomington Jewish Cmty.*, 982 N.E.2d 329, 339 (Ind. Ct. App. 2013) (affirming summary

judgment in favor of synagogue on retaliation grounds where synagogue stated that reason for

termination was, *inter alia*, inability or unwillingness to follow expectations for rabbinic

behavior).

In this case, Plaintiffs complain that First Baptist negligently retained its agent, Mr.

Kimmel. As contrasted from the courts that have applied the ministerial exception, this case does

not present a dispute between an employee and employer based upon federal employment laws.

This Court should not expand the scope of the defense to situations where it was never intended

to apply.

Moreover, resolving this case will not require a determination of religious doctrine. As the Court stated in its September 15, 2016 Order, a claim of negligent retention has three elements: (1) a duty of care owed by an employer to a third person, (2) breach of that duty, and (3) injury to the third person proximately caused by the employer's breach. *See* Order at 4, dated September 15, 2016, ECF No. 27 (citing *Scott v. Retz*, 916 N.E.2d 252, 257 (Ind. Ct. App. 2009)) This Court added that proving negligent retention will require the following determinations: (1) whether First Baptist exercised reasonable care, (2) whether First Baptist knew that Mr. Kimmel had a "habit of misconduct that is dangerous to others," and (3) whether Mr. Kimmel exceeded the scope of his employment to commit a tortious injury. Order at 5, dated September 15, 2016, ECF No. 27 (citing *Konkle v. Henson*, 672 N.E.2d 450, 454-55 (Ind. Ct. App. 1996); *Briggs v. Finley*, 631 N.E.2d 959, 966-67 (Ind. Ct. App. 1994); *Clark v. Aris, Inc.*, 890 N.E.2d 760, 765 (Ind. Ct. App. 2008). First Baptist fails to explain how any of the Court's determinations will involve application of religious doctrine. First Baptist does not otherwise challenge the sufficiency of Plaintiffs' Claims. The Court should deny First Baptist's Motion.

<u>**CONCLUSION**</u>

Contrary to First Baptist's Motion, the ecclesiastical abstention doctrine does not apply to this case, which involves sales of fraudulent promissory notes. Initially, First Baptist's argument asks the Court to rule on its affirmative defenses by way of a Rule 12(b)(1) Motion to Dismiss for lack of subject matter jurisdiction. This Motion should be denied because it does not raise a jurisdictional issue, only a potential defense to liability. The ecclesiastical abstention doctrine does not apply to this case because Plaintiffs do not ask the Court to review an ecclesiastical decision or interpret religious doctrine, only to decide whether First Baptist bears responsibility for Mr. Kimmel's fraudulent conduct in selling the Sure Line Notes. This determination can be

made using neutral principles of law. First Baptist fails to explain how Plaintiffs' allegations about Mr. Kimmel render him a minister so as to fall within the ministerial exception. Even if it could, the ministerial exception only applies to except conduct from the protection of federal employment laws, not for all conduct in which a minister might engage. The Court must deny the Motion.

Dated: September 5, 2017                    Respectfully Submitted,


                                            /s/ Jared M. Schneider
                                            One of Plaintiffs' Attorneys

John S. Burke (ARDC # 6208743)
Jared M. Schneider (ARDC #6318314)
HIGGINS & BURKE, P.C.
2560 Foxfield Road, Suite 200
Saint Charles, Illinois 60174
P: (630) 762.9081
F: (630) 762.9084